**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| YOUTH 71FIVE MINISTRIES, <br><br> *Plaintiff - Appellant*, <br><br> v. <br><br> CHARLENE WILLIAMS, Director of the Oregon Department of Education, in her individual and official capacities; BRIAN DETMAN, Director of the Youth Development Division, in his individual and official capacities; CORD BUEKER, Jr., Deputy Director of the Youth Development Division, in his individual and official capacities, <br><br> *Defendants - Appellees*. | No. 24-4101 <br><br> D.C. No. 1:24-cv-00399-CL <br><br> ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the District of Oregon
Mark D. Clarke, Magistrate Judge, Presiding

Argued and Submitted November 20, 2024
Pasadena, California

Filed August 18, 2025
Amended November 26, 2025

Before: Johnnie B. Rawlinson, Morgan B. Christen, and
Anthony D. Johnstone, Circuit Judges.

Order;
Opinion by Judge Johnstone

## SUMMARY[*]

### First Amendment

In a case in which Youth 71Five Ministries alleges that the Oregon Department of Education, through its Youth Development Division, violated 71Five's First Amendment rights when the Division withdrew its conditional award of a grant to 71Five, the panel (1) amended its opinion filed August 25, 2025; (2) withdrew Judge Rawlinson's separate concurrence; (3) denied the petition for rehearing en banc; and (4) affirmed in part and reversed in part the district court's denial of 71Five's request for a preliminary injunction and its dismissal of 71Five's claims based on qualified immunity.

The Division added a new grant eligibility Rule that prohibits grantees from discriminating based on religion, and withdrew 71Five's conditional grant award after

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

discovering that 71Five imposes religious requirements on all employees and volunteers.

The panel affirmed the district court's decision not to enjoin the Division's enforcement of the Rule as to 71Five's grant-funded initiatives. 71Five was unlikely to succeed on the merits of its claim that the Rule violates the First Amendment right to the free exercise of religion because the Rule is neutral and generally applicable, and likely satisfies rational-basis review. Nor was 71Five likely to succeed on the merits of its novel religious autonomy claims that conditioning grant funding on compliance with the Rule impermissibly interferes with its choice of ministers and faith-based hiring of non-ministers.

Addressing 71Five's claim that the Rule abridges its expressive association by requiring it to accept employees and volunteers who disagree with its message, the panel held that the Rule was likely permissible as a reasonable and viewpoint-neutral regulation as to Division-funded initiatives. But to the extent that Rule restricts 71Five's selection of speakers to spread its Christian message through initiatives that receive no Division funding, the Rule likely imposes an unconstitutional condition. Accordingly, the panel directed the district court to enter an order enjoining enforcement of the Rule as to initiatives that do not receive grant funding from the Division.

The panel affirmed the district court's dismissal of 71Five's claims for damages because 71Five did not allege any violation of a clearly established right, and therefore defendants were entitled to qualified immunity. However, the panel reversed the district court's dismissal of 71Five's claims for declaratory and injunctive relief, against which qualified immunity does not protect.

## COUNSEL

Jeremiah Galus (argued), James A. Campbell, Mark Lippelmann, and Ryan J. Tucker, Alliance Defending Freedom, Scottsdale, Arizona; David A. Cortman, Alliance Defending Freedom, Lawrenceville, Georgia; John J. Bursch, Alliance Defending Freedom, Washington, D.C.; for Plaintiff-Appellant.

Kirsten M. Naito (argued), Assistant Attorney General; Benjamin Gutman, Interim Deputy Attorney General; Ellen F. Rosenblum and Dan Rayfield, Attorneys General; Oregon Department of Justice, Salem, Oregon; for Defendants-Appellees.

Michael P. Farris, National Religious Broadcasters, Washington, D.C., for Amicus Curiae National Religious Broadcasters.

Barbara A. Smith, Seth M. Reid, and Kolten C. Ellis, Bryan Cave Leighton Paisner LLP, St. Louis, Missouri; Christian M. Poland, Bryan Cave Leighton Paisner LLP, Chicago, Illinois; for Amici Curiae Christian Legal Society, Council of Christian Colleges and Universities, Religious Freedom Institute, Coalition of Virtue, Cardinal Newman Society, Great Northern University, International Alliance for Christian Education, American Association of Christian Schools, Association of Classical Christian Schools, Association of Christian Schools International, and Association for Biblical Higher Education in Canada and the United States.

## ORDER

The opinion filed August 25, 2025, and reported at 153 F.4th 704, is hereby amended, and Judge Rawlinson's separate concurrence is withdrawn. The amended opinion will be filed concurrently with this Order.

The panel has voted unanimously to deny the petition for rehearing en banc. The full court has been advised of the petition for rehearing en banc, and no judge of the court has requested a vote on whether to rehear the matter en banc. *See* Fed. R. App. P. 40. Accordingly, Appellant's petition for rehearing en banc (Dkt. No. 49) is **DENIED**. Further petitions are permitted pursuant to FRAP 40.

## OPINION

JOHNSTONE, Circuit Judge:

Oregon's Department of Education, through its Youth Development Division, runs a Youth Community Investment Grant Program. The Program funds community organizations that serve at-risk youth in furtherance of the Division's statutory goals to support educational success, prevent crime, and reduce high-risk behaviors. The Division awards grants through a competitive application process that requires applicants to certify compliance with the Division's policies. To ensure that its grants benefit Oregonians of all backgrounds, the Division implemented a new policy for the 2023–2025 grant cycle requiring applicants to certify that they "do[] not discriminate . . . with regard to," among other protected characteristics, religion.

Since 2017, Youth 71Five Ministries ("71Five") has received funding from the Division for several of its initiatives. While it serves all youth who choose to participate, 71Five's "primary purpose" is "to teach and share about the life of Jesus Christ." To that end, 71Five requires that its board members, employees, and volunteers agree to a Christian Statement of Faith and be involved in a local church. Because 71Five's hiring practices violate the Division's antidiscrimination policy, the Division withdrew its conditional award of a grant for 2023–2025. 71Five sued for equitable and monetary relief and sought a preliminary injunction. It claims that the Division's enforcement of the antidiscrimination policy violates its free-exercise, religious-autonomy, and expressive-association rights under the First Amendment. The district court declined to grant the preliminary injunction and dismissed 71Five's claims based on qualified immunity. We affirm in part, reverse in part, and remand.

Though 71Five advances several claims, most of them boil down to an argument that the Division treats it worse than secular grantees because of its religious exercise or message. If that is true, then the Division almost certainly violates the First Amendment. But the district court did not abuse its discretion in determining that—on the current record—71Five has yet to show any such discrimination. We therefore affirm the district court's decision not to enjoin the Division's enforcement of its policy as to 71Five's grant-funded initiatives. Even absent discrimination, however, the Constitution does not permit the Division to leverage its grants to restrict 71Five's expression in initiatives that receive no public funds. To the extent that the Division's nondiscrimination policy applies beyond 71Five's grant-funded initiatives, the policy likely violates 71Five's right of

expressive association. At this early stage, 71Five is entitled to a preliminary injunction on that basis, and it can continue to pursue final declaratory and injunctive relief for all its claims. But because 71Five does not allege a violation of any "clearly established" right, qualified immunity bars its claims for damages.

## I.  71Five challenges the Division's religious non-discrimination Rule.

Oregon's Department of Education created its Youth Development Division "to invest in communities to ensure equitable and effective services for youth." As part of that mission, the Division administers the Youth Community Investment Grant Program, which funds community-based initiatives serving youth at risk of disengaging from school or work. The Program serves the Division's statutory goal of "[p]rovid[ing] services to children and youth in a manner that supports educational success, focuses on crime prevention, reduces high risk behaviors," and generally "improve[s] outcomes for youth[.]" To ensure that its grants benefit communities across Oregon, the Division funds grantees that work in different regions, provide a wide array of services, and offer "culturally responsive" programs tailored to the "perceptions and behaviors unique to [the] specific culture" of various groups.

The Division awards grants through a competitive application process, which requires applicants to certify that they meet certain eligibility requirements. For the 2023–2025 cycle, the Division added a new eligibility Rule requiring every grant applicant to certify that it "does not discriminate in its employment practices, vendor selection, subcontracting, or service delivery with regard to race, ethnicity, religion, age, political affiliation, gender,

disability, sexual orientation, national origin or citizenship status." The Division added the Rule to align with other state agencies' practices and to further its "commitment to equitable access, equal opportunity, and inclusion."

Youth 71Five Ministries is a nonprofit Christian ministry that "exists to share God's Story of Hope with young people." 71Five fulfills this mission by offering youth-oriented programs that "provide social interaction, vocational training, and meaningful relationships, all while emphasizing the importance of having a relationship with Jesus Christ." The ministry's services include youth centers, apprenticeship and career programs, camps, conflict-resolution workshops, and mentoring. While these various services "strive to meet participants' physical, mental, emotional, and social needs," 71Five's "primary purpose" is "to teach and share about the life of Jesus Christ."

71Five does not discriminate in its vendor selection, subcontracting, or service delivery. But because it "depends on its staff and volunteers to fulfill the ministry's distinctly Christian mission and purpose," by "articulat[ing] and advanc[ing] its Christian messages," 71Five "requires all board members, employees and volunteers 'to be authentic followers of Christ.'" Officers, staff, and volunteers must "subscribe and adhere" to a "Statement of Faith" reflecting "the beliefs of historic Christianity" and "must also be actively involved in a local church." And although it serves students and families regardless of their religion, 71Five "encourage[s] [them] to be involved in a local church too."

From 2017 to 2023, the Division awarded seven grants to 71Five. In 2023, after the Division implemented the Rule, 71Five again applied for grants to fund its youth centers and "Break the Cycle," a mountain-biking initiative that serves

youth in juvenile correction facilities. Though it discriminates in employment based on religion, 71Five certified in its applications that it complied with the Rule because it believed its religious hiring practices were constitutionally exempt. In July 2023, the Division conditionally awarded 71Five grants totaling $410,000.

Four months later, the Division received an anonymous report that, according to its website, 71Five discriminates in hiring on the basis of religion. In response, the Division reviewed 71Five's website and discovered that 71Five imposes religious requirements on all employees and volunteers. The Division then wrote to 71Five to confirm what its website suggested: that 71Five discriminates based on religion in apparent violation of the Rule. 71Five's executive director confirmed that the ministry requires applicants for staff and volunteer positions to affirm its Statement of Faith and expects them to be affiliated with a local church. As a result, the Division withdrew the conditional awards.

71Five sued several state officials under 42 U.S.C. § 1983. 71Five claimed that the Defendants' enforcement of the Rule violates its First Amendment rights to the free exercise of religion, religious autonomy, and expressive association. 71Five sought declaratory and injunctive relief against the Defendants in their official capacities, as well as damages from the Defendants in their individual capacities.

71Five also moved for a preliminary injunction to reinstate its conditionally awarded grants and to enjoin the Division from refusing to award future grants based on 71Five's religious hiring practices. The Defendants opposed the motion and moved to dismiss 71Five's claims for damages based on qualified immunity. In its reply brief in

support of the motion for a preliminary injunction, 71Five argued—for the first time and based on new factual assertions—that the Division allows secular grantees to violate the Rule by "openly discriminat[ing] in the provision of services based on race, ethnicity, gender, and national origin[.]"

The district court denied the preliminary injunction because it found that 71Five was unlikely to succeed on the merits, any past monetary harm would be reparable without an injunction, and neither the balance of equities nor public interest favored an injunction. For the same reasons it deemed 71Five unlikely to succeed on the merits, the district court determined that the Defendants were entitled to qualified immunity. Though the Defendants moved to dismiss only the damages claims, the district court dismissed all claims with prejudice. After 71Five timely appealed, a motions panel of this Court granted an emergency injunction and set the case for argument on an expedited basis.

We have jurisdiction to review the denial of a preliminary injunction under 28 U.S.C. § 1292(a)(1), and we review such decisions for abuse of discretion. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.* ("*FCA*"), 82 F.4th 664, 680 (9th Cir. 2023) (en banc). "A district court abuses its discretion when it utilizes 'an erroneous legal standard or clearly erroneous finding of fact.'" *Id.* (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)).

## II. The district court abused its discretion only in declining to enjoin the Rule's application beyond Division-funded initiatives.

71Five seeks a preliminary injunction on the grounds that the Division's enforcement of the Rule violates its

religious and expressive freedoms under the First Amendment. To obtain a preliminary injunction, 71Five must establish that (1) it "is likely to succeed on the merits," (2) it "is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its] favor," and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Where, as here, the party opposing injunctive relief is a government entity, the third and fourth factors—the balance of equities and the public interest—'merge.'" *FCA*, 82 F.4th at 695 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

Likelihood of success is the most important factor in the analysis, particularly where a plaintiff alleges a constitutional violation. *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024). And here, it is the only factor we need to consider at any length because the other three factors favor an injunction. First, if 71Five shows that it is likely to succeed on the merits, it has "demonstrate[d] the existence of a colorable First Amendment claim" and established the requisite irreparable injury. *See FCA*, 82 F.4th at 694–95 (quoting *Cal. Chamber of Com. v. Council for Educ. & Rsch. On Toxics*, 29 F.4th 468, 482 (9th Cir. 2022)). Similarly, if "we find that [the Rule] offends the First Amendment, . . . the balance of hardships favors" 71Five. *Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 749 (9th Cir. 2012); *but cf. Dep't of Educ. v. California*, 145 S. Ct. 966, 968–69 (2025) (noting that the government's inability to recover grant funds after they are disbursed weighs against compelling immediate disbursement). And "it is always in the public interest to prevent the violation of a party's constitutional rights." *FCA*, 82 F.4th at 695 (quoting *Am. Beverage Ass'n v. City of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019)).

One last note on the applicable standard: we have so far assumed that 71Five must show only that it is *likely* to succeed on the merits. This standard applies to prohibitory injunctions, which aim to preserve the status quo by preventing a party from taking action. *FCA*, 82 F.4th at 684 (quoting *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060 (9th Cir. 2014)). The Defendants argue, and the district court concluded, that the standard for mandatory injunctions applies. A mandatory injunction alters the status quo by requiring a party to take action and thus "place[s] a higher burden on the plaintiff to show 'the facts and law *clearly* favor the moving party.'" *Id.* (quoting *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994)). But we determine the status quo based on "the legally relevant relationship between the parties before the controversy arose," that is, before the action challenged in the complaint occurred. *Ariz. Dream*, 757 F.3d at 1061 (emphasis omitted). Here, the challenged action is the Division's enforcement of the Rule against 71Five; before that, 71Five had a conditional grant award and was eligible for future Division funding. "Because it was the [Division]'s action that 'affirmatively changed' that status quo and [71Five's] motion for a preliminary injunction seeks to restore that status quo, the relief sought is properly viewed as a prohibitory injunction." *FCA*, 82 F.4th at 685. We therefore disagree with the district court and decline the Defendants' request to apply the heightened standard for mandatory injunctions.

We turn to 71Five's likelihood of success on the merits of its First Amendment claims. The district court did not abuse its discretion in concluding that 71Five is unlikely to succeed on its free-exercise and religious-autonomy claims, and the Rule's application to Division-funded initiatives is likely a permissible burden on 71Five's expressive

association. But applying the Rule to initiatives that receive no grant funding likely violates 71Five's right of expressive association. Denying a preliminary injunction as to those initiatives was an abuse of discretion.

### A. The Rule likely does not prohibit the free exercise of religion.

The Free Exercise Clause of the First Amendment, applicable to the states under the Fourteenth Amendment, provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. amend. I; U.S. Const. amend XIV. But not all laws that burden religious exercise presumptively violate this mandate. "[L]aws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021) (citing *Emp. Div., Dep't. of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 878–82 (1990)). The Defendants do not dispute that the Rule burdens 71Five's religious exercise, so our analysis turns on whether the Rule is both neutral and generally applicable. Although 71Five claims that the Rule is neither, the district court did not abuse its discretion in determining that the Rule is both.

#### 1. The Rule is likely neutral.

"[I]f it is to respect the Constitution's guarantee of free exercise," the Division "cannot impose regulations that are hostile to . . . religious beliefs" or engage in "even 'subtle departures from neutrality' on matters of religion." *Masterpiece Cakeshop v. Colo. Civ. Rts. Comm'n*, 584 U.S. 617, 638 (2018) (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993)). We may infer hostility from "the historical background of the decision under challenge, the specific series of events leading to the

enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *FCA*, 82 F.4th at 690 (quoting *Masterpiece Cakeshop*, 584 U.S. at 639).

71Five does not contend that any historical background or events leading to the Division's adoption of the Rule show hostility to religion. Nor does 71Five contend that Division officials made any statements of the kind courts have found to show hostility to religion. *See FCA*, 82 F.4th at 692; *Masterpiece Cakeshop*, 584 U.S. at 634–36; *Lukumi*, 508 U.S. at 541–42. Instead, 71Five's motion argued that the Division's hostility toward religion was reflected in its "target[ed]" enforcement of the Rule against 71Five while excepting secular groups, which operated to "single out the ministry's religious beliefs and practices." But as we discuss below, the district court did not clearly err in finding that the Division did not and could not grant such exceptions. 71Five also asserts that the Division "went out of its way to scrutinize 71Five's website" without inspecting secular organizations' websites, showing animus toward religion. Yet 71Five admits that the Division first reviewed 71Five's website based on an anonymous complaint. And the record contains no evidence that the Division received similar complaints about any secular grantee.

71Five next argues that the Rule is hostile toward religion because "disqualifying otherwise eligible recipients from a public benefit 'solely because of their religious character' imposes 'a penalty on the free exercise of religion'" that is not neutral. *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 475 (2020) (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017)). It styles this argument as a distinct claim, but

we have situated this analysis within our ordinary framework for free-exercise claims under *Smith*. *See Loffman v. Cal. Dep't of Educ.*, 119 F.4th 1147, 1166–69 (9th Cir. 2024). In *Carson ex rel. O.C. v. Makin*, the Supreme Court held that denying public funds based on an entity's religious use for those funds is no different than denying funds based on religious status because, in practice, only religious entities use funds for religious purposes. 596 U.S. 767, 787–88 (2022). So 71Five contends that, in disqualifying potential grantees who discriminate in hiring based on religion, the Rule effectively "exclude[s] otherwise eligible organizations because of their religious character and exercise."

But unlike the religious-use prohibition at issue in *Carson*, the Rule does not deny funding based on a practice exclusive to religious organizations. Government agencies, secular corporations, and religious ministries alike might engage in religion-based employment discrimination. *See, e.g.*, *Bolden-Hardge v. Off. of Cal. State Controller*, 63 F.4th 1215, 1219–20 (9th Cir. 2023) (government); *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 770–71 (2015) (private retailer). So the Rule does not discriminate based on religious status or exercise; it merely disqualifies a class of potential grantees—those who discriminate based on religion—that includes both secular and religious organizations.

Nor does the Rule "grant[] a denominational preference by explicitly differentiating *between* religions based on theological practices." *Catholic Charities Bureau, Inc. v. Wisc. Lab. & Indus. Rev. Comm.*, 605 U.S. 238, 250 (2025) (emphasis added). 71Five contends that the Rule does so because it permits the Division to fund religious grantees whose beliefs, unlike 71Five's, do not require them to hire only co-religionists. While that may be the Rule's result, it is

not due to any "explicit [or] deliberate distinctions between different religious organizations" that would render the Rule presumptively unconstitutional. *Larson v. Valente*, 456 U.S. 228, 246 n.23 (1982). Rather, it is the indirect consequence of the Rule's general prohibition on religious exclusion by all grantees, whether faith-based or not. Such "'secular criteria' that 'happen to have a 'disparate impact' upon different religious organizations" do not contravene the First Amendment's mandate of denominational neutrality. *Catholic Charities*, 605 U.S. at 250 (quoting *Larson*, 456 U.S. at 246 n.23). The Rule is therefore neutral as to religion.

### 2. The Rule is likely generally applicable.

A policy is not generally applicable if the government can or does apply it in a way that disfavors religious activity. *FCA*, 82 F.4th at 686. So the policy may not have any discretionary "mechanism for individualized exemptions" that "invites the government to consider the particular reasons for a person's conduct." *Id.* at 687 (quoting *Fulton*, 593 U.S. at 533). And "the government may not 'treat . . . comparable secular activity more favorably than religious exercise.'" *Id.* at 686 (omission in original) (quoting *Tandon v. Newsom*, 593 U.S. 61, 62 (2021)). The district court did not abuse its discretion in determining that the Rule likely satisfies both requirements.

### a. The Rule does not provide for individualized exemptions.

71Five has not shown that the Rule contains any "mechanism for individualized exemptions" that gives the Division discretion to discriminate against religious conduct. *Fulton*, 593 U.S. at 533 (citation omitted). Under the Rule, an "Applicant must complete all . . . Certification information." That language is mandatory, leaving the

Division no room to make exceptions. 71Five recognizes as much, conceding that a "failure to check the box" confirming compliance with the Rule "would have caused 71Five's [grant] application . . . [not] to be considered."

Unable to show that the Rule itself contains a mechanism for exemptions, 71Five points to a separate policy providing that "[i]t may be possible" for grant recipients "to negotiate some provisions of the final Grant," including the scope of work to be funded. 71Five argues that, under this separate policy, the Division may waive grantees' compliance with the Rule. But on its face, that policy allows the Division only to negotiate the terms of its agreements with applicants who have already satisfied baseline eligibility requirements like the Rule. And the Division's director confirmed that those eligibility requirements cannot be waived or negotiated. In any case, the policy notes that "many provisions cannot be changed," and 71Five offers no evidence that the Rule is among the negotiable provisions. The district court thus did not clearly err in finding that the Rule has no mechanism for individualized exemptions.

> b. The Division likely treats comparable religious and secular activity the same.

It was also within the district court's discretion to find that, in enforcing the Rule, the Division does not treat 71Five's religious exercise less favorably than comparable secular activity. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the [policy] at issue." *Tandon*, 593 U.S. at 62 (citing *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 17–18 (2020) (per curiam)). The Division's interest is its "commitment to equitable access, equal opportunity, and

inclusion" in the programs it funds. Neither 71Five's complaint nor its motion for a preliminary injunction identified any secular activity funded by the Division that undermines the Division's commitment to equity and inclusion like 71Five's religious hiring practices do. Instead, 71Five's motion argued that the Rule triggers strict scrutiny under the Free Exercise Clause only for the reasons we have already rejected: that the Rule is not generally applicable due to a "[s]ystem of [i]ndividualized [e]xemptions" and is not neutral because it "[t]argeted" 71Five's religious beliefs. So the district court concluded that the Division does not favor comparable secular activity over 71Five's religious exercise.

71Five asks us to reverse based on a new argument and new factual assertions in its reply brief in district court in support of the motion for a preliminary injunction. There, for the first time, 71Five attached screenshots of several secular grantees' websites, which state that the grantees: "serve African and African American families" through programs "designed to . . . empower[] Black students"; "serve & work with . . . Latin/e/o/a/x, immigrant, Indigena, [and] Afrodescendiente" communities; "create equitable opportunities for African refugees and immigrant[s]"; "focus on the needs of . . . immigrant Latine women"; and are "committed to providing a pro-girl and girl-centered environment" through "programming . . . designed for those who identify as girls," are "exploring their gender identity," or "are gender non-conforming." The website of one grantee featured a page addressing common questions, including "Why not boys?"

Based on these screenshots, 71Five raised a new argument that the Division allows secular grantees to categorically deny services to particular demographic groups. The reply brief further argued, again for the first

time, that the secular grantees' alleged discrimination in service provision is akin to 71Five's admitted discrimination in hiring, as both violate the Rule. Because, the reply brief contended, the Division has not revoked funding from these secular grantees, it treats comparable secular activity more favorably than 71Five's religious exercise.

71Five faults the district court for rejecting its belated argument based on the court's concerns about "depriving Defendants of notice and an opportunity to respond." But a "district court need not consider arguments raised for the first time in a reply brief." *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007). So it did not abuse its discretion by declining to do so. And now, on appeal, 71Five asks us to consider more screenshots of secular grantees' websites that were not included even in its reply brief to the district court. We decline to consider this evidence in the first instance. *See* Fed. R. App. P. 10(a)(1); *Martinez v. Newsom*, 46 F.4th 965, 975 (9th Cir. 2022). Based on the evidence properly before the district court, it was not an abuse of discretion to conclude that the Division likely treats comparable secular and religious activity the same.

> c.  On this record, we affirm the district court's preliminary conclusion that the Rule is likely generally applicable.

At this early stage, the record supports the district court's determination that the Rule is generally applicable. To be clear, we do not foreclose the possibility that 71Five may prove on remand that some secular grantees refuse to serve individuals outside their target demographics. In that case, the Division's continued funding of those secular grantees could reveal that it has discretion to grant exemptions from the Rule. *See Fulton*, 593 U.S. at 533. And if 71Five shows

that such refusals of service are comparable to its own exclusionary hiring practices, that would doubly trigger strict scrutiny, as the Division would be favoring comparable secular activity over religious exercise. *FCA*, 82 F.4th at 686. As is often the case "at a very preliminary stage of the proceedings, . . . [f]urther development of the record . . . as this case progresses," such as the timely presentation of screenshots of secular grantees' websites, "may alter [the district court's] conclusions." *In re Creech*, 119 F.4th 1114, 1119 (9th Cir. 2024) (alteration in original; citation omitted); *see also Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("[T]he findings of fact and conclusions of law made by a court [deciding] a preliminary injunction are not binding at trial on the merits."). But under our deferential standard of review, the district court did not abuse its discretion in refusing to consider 71Five's new arguments and evidence in its reply brief. So we must affirm the district court's preliminary conclusion.

### 3.   The Rule likely satisfies rational-basis review.

Because the Rule is neutral and generally applicable, it is subject only to rational-basis review. *Tingley v. Ferguson*, 47 F.4th 1055, 1084 (9th Cir. 2022). "States carry a 'light burden' under this review"—a "law is 'presumed to be valid and will be sustained' . . . if it is 'rationally related to a legitimate state interest.'" *Id.* at 1077–78 (quoting *Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*, 880 F.3d 450, 457 (9th Cir. 2018)). The Division adopted the Rule to, among other reasons, better reflect its "commitment to equitable access, equal opportunity, and inclusion." That is a legitimate interest. *Cf. Doe v. Horne*, 115 F.4th 1083, 1112 (9th Cir. 2024) (explaining that "[s]tates have important interests in inclusion, nondiscrimination, . . . [and] ensuring equal athletic

opportunities"); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 625 (1984). The Rule rationally furthers that interest by ensuring that Division-funded initiatives are equally open to employees, volunteers, and participants regardless of race, sex, religion, or any other protected characteristic. The district court therefore did not abuse its discretion in determining that 71Five is not likely to succeed on the merits of its free-exercise claim.

**B. The district court did not abuse its discretion in concluding that 71Five's religious-autonomy claims are unlikely to succeed.**

In addition to guaranteeing the free exercise of religion, the First Amendment prohibits laws "respecting an establishment of religion[.]" U.S. Const. amend. I. Together, "the Religion Clauses protect the right of churches and other religious institutions to decide matters 'of faith and doctrine' without government intrusion." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020) (quoting *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 186 (2012)). That broad principle of religious autonomy has given rise to two related doctrines. *See id.* at 747. First, ecclesiastical abstention "limit[s] the role of civil courts in the resolution of religious controversies that incidentally affect civil rights." *Puri v. Khalsa*, 844 F.3d 1152, 1162 (9th Cir. 2017) (quoting *Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*, 426 U.S. 696, 710 (1976)). Second, the ministerial exception "precludes application of [certain] legislation to claims concerning the employment relationship between a religious institution and its ministers." *Hosanna-Tabor*, 565 U.S. at 188. 71Five argues that these doctrines prevent the Division from conditioning grant funding on compliance with the Rule, as

doing so impermissibly interferes with 71Five's choice of ministers and faith-based hiring of non-ministers.

The district court declined to address the merits of 71Five's argument. Instead it determined that 71Five is unlikely to succeed because ecclesiastical abstention and the ministerial exception are "affirmative defense[s] against suit" and not "standalone right[s] that can be wielded against a state agency." Indeed, we have consistently described and applied the ministerial exception as an affirmative defense. *Puri*, 844 F.3d at 1157–58; *Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 945–51 (9th Cir. 1999), *overruled on other grounds by Markel v. Union of Orthodox Jewish Congregations of Am.*, 124 F.4th 796, 810 n.6 (9th Cir. 2024). And we have explained that the ecclesiastical-abstention doctrine limits civil courts' redetermination of inherently religious decisions. *See Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 819 F.2d 875, 878 n.1 (9th Cir. 1987); *Puri*, 844 F.3d at 1162–64. The Supreme Court has similarly characterized these doctrines. *See Watson v. Jones*, 80 U.S. (13 Wall.) 679, 733 (1871) (first articulating the principle of religious autonomy as requiring "civil courts" to defer to ecclesiastical authorities on questions of "theological controversy, church discipline, [and] ecclesiastical government"); *Milivojevich*, 426 U.S. at 710–14; *Hosanna-Tabor*, 565 U.S. at 195 n.4 (recognizing the ministerial exception "as an affirmative defense to an otherwise cognizable claim"). And we are aware of no court of appeals that treats the religious-autonomy doctrines as the basis for standalone claims challenging legislative or executive action, rather than as defenses against or limits upon plaintiffs' invocation of *judicial* authority. *See, e.g.*, *O'Connell v. U.S. Conf. of Cath. Bishops*, 134 F.4th 1243, 1253–54 (D.C. Cir. 2025); *Tucker v. Faith Bible Chapel Int'l*,

36 F.4th 1021, 1028–29 (10th Cir. 2022); *Demkovich v. St. Andrew the Apostle Parish*, 3 F.4th 968, 977 (7th Cir. 2021) (en banc); *McRaney v. N. Am. Mission Bd. of S. Baptist Convention, Inc.*, 966 F.3d 346, 348 n.1 (5th Cir. 2020).

71Five has identified no opinion from the Supreme Court, this Court, or another court of appeals suggesting that plaintiffs may assert ecclesiastical abstention or the ministerial exception as § 1983 claims, nor any "historical practices [or] understandings" that would justify our recognition of these novel claims under the Religion Clauses. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535–36 (2022) (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)). Without more, we cannot say that the district court abused its discretion in concluding that 71Five' religious-autonomy claims are unlikely to succeed.

## C. The Rule's application beyond grant-funded activities likely violates 71Five's right of expressive association.

The Free Speech Clause of the First Amendment protects the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends[,]" which "plainly presupposes a freedom not to associate." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647–48 (2000) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622–23 (1984)). 71Five claims that the Rule abridges its expressive association by requiring it to accept employees and volunteers "who disagree" with its message "or would express a contrary view." "Even though the district court did not address this argument, we consider it in the first instance because [71Five] raised the argument before the district court." *Rosales-Martinez v. Palmer*, 753 F.3d 890, 897 n.7 (9th Cir. 2014). We hold that 71Five has established that it is

likely to succeed, at least in part. As to Division-funded initiatives, the Rule is likely permissible as a reasonable and viewpoint-neutral regulation of expressive association in a limited public forum—the Grant Program. But to the extent that it restricts 71Five's selection of speakers to spread its Christian message through initiatives that receive no Division funding, the Rule likely imposes an unconstitutional condition.

### 1. The Rule likely burdens 71Five's expressive association.

To establish that the Rule likely burdens its expressive associational right, 71Five first must show that, as a group, it "engage[s] in some form of expression." *Dale*, 530 U.S. at 648, 650 (citing *N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 13 (1988)). It has done so. The ministry is a nonprofit organization incorporated for the purely expressive purpose of "teach[ing] and shar[ing] about the life of Jesus Christ." 71Five presented evidence that it relies on employees and volunteers to fulfill that "overriding religious purpose and mission" by "communicat[ing] and introduc[ing] the Gospel of Jesus Christ to young people and their families." As its executive director explained, 71Five provides "a wide range of voluntary programs" through its employees and volunteers to "guide young people and to help them develop the spiritual, mental, physical, and social components of their lives[.]" "It seems indisputable that an association that seeks to transmit such a system of values engages in expressive activity." *Dale*, 530 U.S. at 650 (citing *Roberts*, 468 U.S. at 636 (O'Connor, J., concurring)).

Second, 71Five must show that compliance with the Rule would likely affect that expression "in a significant way." *Id.* at 648, 650 (citing *N.Y. State Club Ass'n*, 487 U.S.

at 13). An organization cannot "erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message." *Id.* at 653. Instead, the right of expressive association protects an organization's decisions to choose its messengers based only on what a person expresses. *Id.*; *see also Roberts*, 468 U.S. at 647–48. So when a law compels an organization to accept a messenger who expresses views inconsistent with the core values the organization promotes, the law may impose a cognizable burden on expressive association. *Dale*, 530 U.S. at 654; *see also Roberts*, 468 U.S. at 627–28 (1984); *N.Y. State Club Ass'n*, 487 U.S. at 13. The key inquiry for finding a burden is whether the law would "require the [organization] 'to abandon or alter'" its protected expressive activities. *N.Y. State Club Ass'n*, 487 U.S. at 13 (quoting *Bd. of Dirs. of Rotary Int'l. v. Rotary Club of Duarte*, 481 U.S. 537, 548 (1987)).

71Five has established that complying with the Rule would likely alter its expression "in a significant way." *Dale*, 530 U.S. at 648. The ministry's executive director attested that 71Five selects employees and volunteers to carry out its expressive mission by "shar[ing] God's Story of Hope" with those it serves. Though 71Five imposes several religious requirements on employees and volunteers, its core demand is that they "subscribe and adhere" to a "Statement of Faith, which reflects the beliefs of historic Christianity" that 71Five hopes to spread. In essence, 71Five wants its spokespeople to affirm the very message they are tasked with communicating on its behalf. Yet the Rule likely prohibits it from doing so. In 71Five's view, the Rule thus compels it not just to use imperfect messengers, but to speak through individuals who reject its message. The Defendants have

offered no evidence at the preliminary injunction stage to rebut 71Five's assertion that all its employees and volunteers contribute to its expressive mission, nor 71Five's argument that the Rule requires it to hire speakers who disavow its religious views.

The Supreme Court found a similar requirement to significantly alter an organization's expressive activity in *Dale.* There, a state antidiscrimination law required the Boy Scouts to accept as an adult leader an outspoken gay-rights activist whose public statements were "inconsistent with the values [the Boy Scouts sought] to instill in its . . . members." *Id.* at 654. Because accepting the activist as a spokesperson would have "force[d] the organization to send a message . . . that the Boy Scouts accept[ed] homosexual conduct as a legitimate form of behavior," contrary to the organization's actual views, the Court held that the law burdened the Boy Scouts' expressive association. *Id.* at 653. On the record before us, the Rule would likely burden 71Five's expressive association in a similar way by forcing it to speak through individuals who reject its Statement of Faith and thereby express their disagreement with 71Five's message.

> ### 2. The Rule is likely a permissible regulation of 71Five's expressive association within Division-funded initiatives.

That the Rule burdens 71Five's expressive association does not end our inquiry—we next consider whether that burden is permissible. 71Five insists that any regulation of expressive association is subject to strict scrutiny. But as for all expression, the appropriate standard depends on context. *See Sullivan v. Univ. of Wash.*, 60 F.4th 574, 580–81 (9th Cir. 2023) (analyzing the expressive association of appointees to

a public committee as the speech of public employees "pursuant to their official duties" under *Garcetti v. Ceballos*, 547 U.S. 410 (2006)).

In *Dale*, the antidiscrimination law under challenge was subject to heightened scrutiny because it directly regulated the expression of organizations like the Boy Scouts, regardless of whether those organizations received government funding. *See* 530 U.S. at 659. That is not the case here. Instead, the Rule affects only those who seek grant funding from the Division. In cases challenging expressive regulations attached to government grants, we usually must decide whether the government is using the grants to facilitate private expression, or whether it is merely hiring private speakers to spread its own message. *See, e.g.*, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833–34 (1995). Where the government itself is speaking, even through private contractors, the First Amendment affords it a freer hand to control such expression. *See id.*; *Boquist v. Courtney*, 32 F.4th 764, 779 (9th Cir. 2022). That is what the Division appears to be doing. It does not award grants simply to enable independent speech—it uses them to enlist grantees in carrying out its own statutory mandate of supporting at-risk youth in Oregon, and it selects its preferred conduits through a competitive application process. So the Rule is perhaps best analyzed as a regulation of government speech, s*ee Rosenberger*, 515 U.S. at 833 (citing *Rust v. Sullivan*, 500 U.S. 173, 194, 196–200 (1991)), or speech by government contractors, *see Bd. of Cnty. Comm'rs, Wabaunsee Cnty. v. Umbehr*, 518 U.S. 668, 673–81 (1996); *Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1258–63 (10th Cir. 2016).

But the Defendants do not argue that the Rule simply shapes the Division's own speech. Instead, they argue, the Rule regulates grantees' use of public funding to facilitate the grantees' independent expression. When the government creates a forum to enable private speech, the applicable free-speech standard depends on the government's purpose for opening its doors or, in this case, its purse. *See Koala v. Khosla*, 931 F.3d 887, 900 (9th Cir. 2019). Where the government holds its resources "open for indiscriminate public use for communicative purposes," the result is a traditional or designated public forum, in which content-based restrictions on expression are subject to strict scrutiny. *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 392 (1993); *see also Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009). The Division's grant program does not, however, facilitate just any speech. It funds speech only by "certain groups" (*i.e.*, select community initiatives) and only on "certain subjects" (*i.e.*, supporting youth development and reducing high-risk behaviors). *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of Law v. Martinez*, 561 U.S. 661, 679 n.11 (2010) (quoting *Pleasant Grove City*, 555 U.S. at 470). As the Defendants argue, the grant program thus looks more like a limited public forum, so "a less restrictive level of scrutiny" applies. *Id.* at 680. To pass constitutional muster, the Rule need only be "reasonable and viewpoint neutral." *Koala*, 931 F.3d at 900.

### a.   Reasonableness.

For the same reasons the Rule satisfies rational-basis review, it is reasonable. The program's funding of "community-based youth development programs and services," aims to support the Division's overall mission of "invest[ing] in communities to ensure equitable and

effective services for youth." In prohibiting certain forms of exclusion from grant-funded projects, the Rule rationally aligns the grant program with that mission, ensuring that the initiatives it funds are equally accessible to and can effectively serve all Oregonians. *Cf. Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 799 (9th Cir. 2011) (finding a university's policy prohibiting discrimination based on religion reasonable in light of the program's purpose "to promote diversity and nondiscrimination"), *abrogated on other grounds by FCA*, 82 F.4th 686.

>   b. Viewpoint Neutrality.

The Rule is also likely viewpoint neutral. The government discriminates based on viewpoint where it "targets not merely a subject matter, 'but particular views taken by speakers on a subject.'" *Vidal v. Elster*, 602 U.S. 286, 293 (2024) (quoting *Rosenberger*, 515 U.S. at 829). Even where there is no intent to suppress a particular message about a topic, a law is viewpoint discriminatory if it treats speech differently "based on the specific motivating ideology or perspective of the speaker." *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 899 (9th Cir. 2018) (quoting *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1277 (9th Cir. 2017)).

Here, the Rule prohibits grantees from excluding employees, vendors, subcontractors, or clients based on their religious expression. But the Rule neither singles out any viewpoint about religion nor favors expressive associations that lack any religious perspective. That distinguishes this case from others in which restrictions on "religious activity" did not merely "exclude religion as a subject matter" but "select[ed] for disfavored treatment those [speakers] with religious . . . viewpoints." *Rosenberger*, 515 U.S. at 831. In

*Lamb's Chapel*, for example, the Supreme Court held that a school district's rule was viewpoint discriminatory because it "permit[ted] school property to be used for the presentation of all views" about certain family issues "except those dealing with the subject matter from a religious standpoint." 508 U.S. 384, 393 (1993). And in *Rosenberger*, the Supreme Court held that a university discriminated based on viewpoint where it refused to fund student publications that "primarily promote[d] or manifest[ed] a particular belief in or about a deity or an ultimate reality" but funded publications expressing no view on such metaphysical topics. 515 U.S. at 831–32, 836–37. The Court explained that religion is not only "a vast area of inquiry," but also "provides . . . a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered." *Id.* at 831. And in *Rosenberger*, "[t]he prohibited perspective, not the general subject matter, resulted in the refusal to make . . . payments," resulting in viewpoint discrimination. *Id.*

By contrast, the Division does not deny funding to all organizations that express a religious viewpoint: it awarded grants to support 71Five's religious programming for five years and continues to fund at least four other faith-based grantees. Nor does the Division treat those organizations differently based on their religious messages. The Rule equally burdens the expressive association of grantees that seek to promote a religious perspective, an antireligious perspective, or no perspective on religion at all. An atheist organization that refuses to employ anyone who professes a belief in God is also disqualified from receiving grant funding under the Rule. And an organization that wishes not to speak about religion and excludes all who express a viewpoint on the topic, whether positive or negative, cannot

receive grant funding either. For example, to avoid offending any of its clients, an organization that provides counseling to families of diverse religious backgrounds might want to prohibit its employees from commenting on the propriety or impropriety of different family structures. But the Rule would bar it from excluding employees who, for religious reasons, refused to sign a statement personally affirming that all family structures should be equally accepted.

The Rule simply disqualifies all potential grantees, regardless of viewpoint, that exclude anyone based on personal religious beliefs. It is therefore viewpoint neutral on its face, even if in practice "it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 (1992). Of course, "a policy that is 'viewpoint neutral on its face may still be unconstitutional if not applied uniformly.'" *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1162 (9th Cir. 2022) (quoting *Alpha Delta*, 648 F.3d at 803). But the district court did not abuse its discretion in finding that the Division has not enforced the Rule in a discriminatory manner. So the Rule is, on this record, likely viewpoint neutral as enforced. *Cf. FCA*, 82 F.4th at 711–12 (Forrest, J., concurring) (stating that a nondiscrimination policy was viewpoint discriminatory due only to its "selective application" to a religious club).

### 3. The Rule is likely an unconstitutional condition on 71Five's expressive association outside Division-funded initiatives.

Though the Rule is likely a permissible restriction on expressive association within the limited public forum of the Program, that does not justify the separate burden it imposes on 71Five as a whole. When a policy attaches strings not

only to government-funded speech, but to the speaker itself, we must further scrutinize the constitutionality of those strings. *See California ex rel. Becerra v. Azar*, 950 F.3d 1067, 1093 (9th Cir. 2020). Even a valid condition on government funding may not "interfere with a recipient's conduct outside the scope of the [government] funded program." *Id.* at 1093 n.24 (citing *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013)).

As 71Five argues, the "Rule does precisely that" by "extending to all 71Five's employees and every aspect of its ministry," including projects that receive no grant funding. At oral argument, the Defendants conceded that the Rule's prohibition on discrimination is not limited to the particular initiatives the Division funds. It applies to grantees as a whole, leaving them no room "to conduct [expressive] activities through programs that are separate and independent from the project that receives [Division] funds." *Rust*, 500 U.S. at 196. Because 71Five seeks Division funds for only some of its projects, requiring it to certify that it does not discriminate in *any* of its projects is likely an unconstitutional condition. This is because the Division "seek[s] to leverage funding to regulate [expressive association] outside the contours of the [Division-funded] program itself." *Agency for Int'l Dev.*, 570 U.S. at 214–15. The Defendants in theory could justify that extra-programmatic burden on 71Five by showing that it satisfies heightened scrutiny. *See Crowe v. Or. State Bar*, 112 F.4th 1218, 1233 (9th Cir. 2024). But they have not yet tried to do so.

71Five's expressive-association claim is therefore likely to succeed only as much as it challenges the Rule's application to its expressive association in initiatives that receive no Division funding. Because the remaining factors

also support granting injunctive relief, 71Five is entitled to a preliminary injunction on that limited basis. *See Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1195 (9th Cir. 2024) ("The scope of the [injunction] must be no broader and no narrower than necessary to redress the injury shown by the plaintiff[s]." (alterations in original) (quoting *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018))).

### III. The district court erred in dismissing 71Five's claims for declaratory and injunctive relief but not its claims for damages.

Finally, we turn from 71Five's motion for a preliminary injunction to the Defendants' motion to dismiss. 71Five challenges the district court's dismissal of all its claims—both for declaratory and injunctive relief and for damages—based on qualified immunity. We have jurisdiction to review that decision under 28 U.S.C. § 1291 and review it de novo, "accepting as true all well-pleaded allegations of material fact and construing them in the light most favorable to the non-moving party." *Hyde v. City of Willcox*, 23 F.4th 863, 869 (9th Cir. 2022) (citing *Padilla v. Yoo*, 678 F.3d 748, 757 (9th Cir. 2012)). In contrast to our analysis of 71Five's motion for a preliminary injunction, this inquiry "consider[s] only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Mendoza v. Amalgamated Transit Union Int'l*, 30 F.4th 879, 884 (9th Cir. 2022) (quoting *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) (per curiam)).

"In § 1983 actions, 'qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would

have known.'" *Sampson v. County of Los Angeles ex rel. L.A. Cnty. Dep't of Child. & Fam. Servs.*, 974 F.3d 1012, 1018 (9th Cir. 2020) (internal quotation marks omitted) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). But "[q]ualified immunity does not apply to claims for declaratory or injunctive relief." *Shinault v. Hawks*, 782 F.3d 1053, 1060 n.7 (9th Cir. 2015) (citing *Hydrick v. Hunter*, 669 F.3d 937, 939–40 (9th Cir. 2012)). So the dismissal of 71Five's claims for declaratory and injunctive relief was error. Still, we agree with the district court that qualified immunity bars 71Five's damages claims.

"To be entitled to qualified immunity at the motion to dismiss stage, an [official] must show that the allegations in the complaint do not make out a violation of a constitutional right or that any such right was not clearly established at the time of the alleged misconduct." *Hampton v. California*, 83 F.4th 754, 765 (9th Cir. 2023) (citing *Pearson*, 555 U.S. at 232–36). Courts "have discretion to address the questions in reverse order." *Sampson*, 974 F.3d at 1018. The district court did so here, dismissing 71Five's claims under the "clearly established" prong.

The complaint does not make out any clearly established violation of 71Five's free-exercise right. 71Five's claim rests on its argument that the Rule is neither neutral nor generally applicable. Yet 71Five does not allege any facts from which we can reasonably infer a lack of neutrality. The complaint alleges that the Division "retained discretion to create exceptions" from the Rule. As the exhibits to the complaint show, however, the alleged waiver provisions do not apply to the Rule. *See Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1117 (9th Cir. 2018) (explaining that, in ruling on a motion to dismiss, we "can consider 'exhibits attached to the Complaint'" (quoting *Daniels-Hall v. Nat'l Educ. Ass'n*, 629

F.3d 992, 998 (9th Cir. 2010))). And while the complaint vaguely alleges that the Rule "has not been applied or enforced consistently," it fails to "identify comparable secular activity that undermines" the Division's interest. *Tingley*, 47 F.4th at 1088.

71Five also fails to establish any clear violation of its right to religious autonomy. Neither the Supreme Court nor we have ever held that the rights protected by the ministerial exception and ecclesiastical abstention may be asserted as standalone claims challenging executive action, rather than as defenses to the invocation of judicial authority. A reasonable official would therefore lack notice that enforcing the Rule against 71Five, without resort to litigation, might violate constitutional protections for religious autonomy.

Finally, whether or not the complaint makes out a violation of 71Five's right of expressive association, that right was not clearly established. 71Five's complaint claims that the Rule violates the First Amendment by attaching nondiscrimination requirements to government grants that are awarded only to select organizations. We are aware of no case, either in this Court or the Supreme Court, clearly establishing that such a requirement impermissibly infringes a grantee's right of expressive association. 71Five relies solely on *Dale*, but that case involved a law forbidding discrimination wholly apart from any government funding scheme. *See* 530 U.S. at 644–45. Our cases finding violations of plaintiffs' expressive association also involve contexts quite different from the grant program at issue here. *See, e.g.*, *Crowe*, 112 F.4th at 1233–40 (compelled membership in state bar); *Perry v. Schwarzenegger*, 591 F.3d 1147, 1163–65 (9th Cir. 2010) (compelled disclosure of ballot-measure campaign's internal communications that

chilled plaintiffs' expressive association); *White v. Lee*, 227 F.3d 1214, 1226–29 (9th Cir. 2000) (sweeping government investigation that chilled plaintiffs' expressive association). None of these cases would put the Defendants on notice that requiring recipients of competitive Division grants not to discriminate violates the First Amendment. *See District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018); *Moore v. Garnand*, 83 F.4th 743, 750 (9th Cir. 2023).

71Five's complaint does not allege a violation of any clearly established right under the First Amendment, so the Defendants are entitled to qualified immunity, and the district court did not err in dismissing 71Five's damages claims with prejudice. *See Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 616–17 (9th Cir. 2018) (holding that plaintiff was likely to succeed on the merits of its constitutional claims and that the doctrine of qualified immunity protected defendants from damages liability).

## IV.  Conclusion

We hold that, on this record, the Division's Rule prohibiting religious discrimination by grantees does not itself violate the First Amendment's prohibitions on religious discrimination. Because the district court did not abuse its discretion in finding that the Division applies the Rule neutrally and without exception to prohibit comparable discrimination by all grantees, 71Five is not likely to succeed on its free-exercise claim as presented in its motion. Nor is 71Five's religious-autonomy claim likely to succeed, as we have never held the ministerial exception or ecclesiastical abstention to be standalone claims.

But 71Five has established that—though the Rule permissibly regulates expressive association within Division-funded initiatives—it likely imposes an

unconstitutional condition to the extent that it applies beyond those projects to regulate 71Five's independent speech. The remaining preliminary-injunction factors are also satisfied. Therefore, we reverse the district court's denial of 71Five's motion for a preliminary injunction and direct the district court to enter an order enjoining enforcement of the Rule as to initiatives that do not receive grant funding from the Division. Because 71Five does not allege any violation of a clearly established right, we also hold that the Defendants are entitled to qualified immunity and affirm the dismissal of 71Five's claims for damages. And we reverse the district court's dismissal of 71Five's claims for declaratory and injunctive relief, against which qualified immunity does not protect.

**AFFIRMED in part, REVERSED in part, and REMANDED.**[1]

---

[1] The emergency injunction, Dkt. No. 18, shall remain in effect until issuance of the mandate. Each party shall bear its own costs on appeal.